MINNIE MYERS *v.* EARL F. MYERS

(No. 9664)

Submitted April 3, 1945. Decided May 1, 1945.

*Martin Brown,* for appellant.
*W. F. Keefer,* for appellee.

RILEY, JUDGE:

Earl F. Myers, defendant in this suit for a divorce based upon the alleged ground of cruel and inhuman treatment of the plaintiff, Minnie Myers, appeals from a decree of the Circuit Court of Marshall County granting an absolute divorce to plaintiff, awarding to her the sole custody and control of the children born to plaintiff and defendant, Donald Frederick Myers, born April 1, 1939, and Leonard Adair Myers, born July 5, 1941, and decreeing to plaintiff suit money, permanent alimony, and certain items of personal property described in the bill of complaint.

The bill of complaint alleges that plaintiff and defendant were married on November 10, 1937, in Marshall County, West Virginia, where they resided together as husband and wife from the time of their marriage until October 25, 1943, when plaintiff by reason of defendant's cruel and inhuman treatment of her, left defendant's home, taking the children with her, and went to the home of her parents in Wheeling, West Virginia, and that since the separation

the parties have not lived or cohabited together. Since her marriage to defendant, plaintiff further alleges that defendant has on numerous occasions mistreated and abused her, has struck her with force and violence about various parts of the body, and, in particular, on October 24, 1943, defendant, in a fit of anger, violently struck plaintiff in the face with such force that she suffered bruises, including what is commonly known as a "black eye", and on the same day that he drove her from the room which she and defendant were wont to share, then obtained a butcher knife from the kitchen of the house, which was located downstairs from the bedrooms, and followed plaintiff into the room occupied by plaintiff's and defendant's son, Donald, to which plaintiff had gone for asylum from defendant, knocked plaintiff down, brandished the knife over her in a threatening manner, and in doing so cut severely a finger of her left hand. By reason of the alleged attack and defendant's conduct in general toward her, plaintiff alleges she fears for her life should she continue to live with defendant, and in order to be safe from defendant's attacks and abuses she went to the home of her parents. The bill of complaint further alleges that defendant is not a proper person to have the custody of the children, because he becomes intoxicated frequently; that he was, in fact, intoxicated when he allegedly committed the assault upon defendant on October 24, 1943; that he gives the children intoxicating drinks and thereby encourages them to drink; and that when intoxicated defendant conducts himself in a manner contrary to the best interests of the children.

Plaintiff further asserts in her bill of complaint that defendant has contracted with his "mother (by adoption)," Catherine Myers, to buy the property in which plaintiff and defendant have been residing, together with a house adjacent thereto, both of which defendant has improved. She does not, however, know the amount of the purchase price, but says it is considerable. In addition plaintiff alleges that she and defendant have purchased and paid for two vacant parcels of land in the same neighborhood.

By the bill of complaint plaintiff seeks: (1) A divorce from defendant from the bonds of matrimony; (2) the custody of the children; (3) alimony and support money for the children; (4) a just decree relating to the property; (5) compliance by defendant *pendente lite* with the contract with defendant's stepmother; and (6) that defendant be ordered to pay court costs and attorneys' fees.

Defendant filed a demurrer and answer to the bill of complaint. The court overruled the demurrer. The answer denies the material allegations of the bill, and, among other things, asserts that as a result of plaintiff's activities and influence he has been ordered to take a preinduction physical examination, and has been found to be physically fit for military and naval service and is subject to call at any time; that plaintiff is not a proper person to have the custody and control of the children independently of defendant; that plaintiff has no legal or equitable interest in the contract with Catherine Myers; that the circuit court does not have jurisdiction to interfere with said contract; that defendant is not, as alleged in the bill of complaint, employed as a contractor-carpenter, but is actively engaged as a general contractor; that the income derived from such business from January 1, 1943, to and including, October, 1943, was approximately one hundred and eighty dollars per month; that since plaintiff left the defendant, which he asserts was on October 26, 1943, and not on October 25, 1943, as alleged in the bill of complaint, he has pleaded with plaintiff to return to their home, which he says is well equipped and well furnished; and that he has visited the plaintiff and the children at plaintiff's parents' home as often as plaintiff would permit him to do so. The answer further asserts that defendant is in love with plaintiff and their children; that it is inequitable and unconscionable that defendant's home should be disintegrated; that defendant is a fit person to have the custody, control, and education of the children, and that if plaintiff should continue to refuse to live with him, then the children could be maintained at his home in Marshall County under the supervision and personal direction of

defendant's stepmother, Catherine Myers, who is willing, if necessary, to assume such responsibility.

Plaintiff filed a replication in which she denies that she endeavored to have her husband inducted into the military or naval service; admits that when she left defendant's home she took with her $220.00 in cash, $20.00 of which plaintiff claims defendant had given her to buy Christmas presents for the children; certain specified insurance policies on defendant's and the children's lives; one United States War bond in the amount of $100.00, payable to plaintiff and defendant and another in the amount of $25.00, issued in the name of the children. The replication admits that defendant has offered to do any honorable thing that plaintiff may require in order to persuade her and the children to return to his home, but that she has no confidence whatever in defendant's promises, and has refused to do so because of fear of her life as expressed in the bill of complaint, and finally the replication prays that the court may partition between plaintiff and defendant the real estate mentioned in the bill of complaint as belonging to them as tenants in common, and may also decree to plaintiff the value of her inchoate right of dower in the real estate belonging to defendant.

After the marriage of plaintiff and defendant on November 10, 1937, they established their home on Boggs Run in Marshall County, a short distance outside the limits of the City of Benwood, where they lived together continuously until their separation on October 26, 1943. Defendant bought from his stepmother, Catherine Myers, a parcel of land on which were located two houses and a garage, under a contract providing for installment payments. He also purchased two vacant lots in the same vicinity, which were conveyed by deed to plaintiff and defendant jointly. The larger of the two houses, consisting of five rooms, plaintiff rented, and the smaller, consisting of four rooms, was occupied by plaintiff and defendant. Defendant himself improved both houses, the improvements to the house occupied by defendant and his family being extensive.

Defendant is an experienced carpenter, mechanic, builder and cabinet maker. Prior to his induction into the armed forces of the United States, he industriously occupied himself in this work, earning therefrom an income of approximately one hundred and eighty dollars a month. At least during the earlier part of their married life, plaintiff and defendant lived happily together. Until the very day of their separation both were accustomed to engage in all night parties almost every Saturday night, either at their home on Boggs Run or at the home of friends or at clubs in the City of Wheeling and its vicinity. At these parties, plaintiff and defendant drank beer and sometimes whiskey. According to plaintiff's testimony, on one occasion defendant became intoxicated to the point of helplessness, and plaintiff admitted that on another occasion she was in the same condition. It is unnecessary for a decision of this case to detail all the happenings on these parties, or to place in the reports of this Court the names of those not immediately concerned in the charges contained in plaintiff's bill of complaint.

Most of the matters relied upon by plaintiff to establish her charge that defendant was guilty of cruel and inhuman treatment toward her clearly do not meet the requirements of our statute. It may be true, as plaintiff testified, that on July 4, 1942, at a picnic on Wheeling Creek, defendant tried to pour beer down her sister's back; that he jumped into a creek fully dressed and waded upstream, thereby humiliating plaintiff; that about a year and a half before the trial of this case defendant became angry because she had counselled him against going at a late hour to the home of a mutual friend, and in a fit of anger defendant drove the truck in which she, defendant and the older child were riding so recklessly that it ran up on the curb and blew out a tire and then in his anger he slammed the door of the truck so hard it broke the glass. It may also be true that on another occasion, defendant tore the blouse of one of their women friends in endeavoring to compel her to dance with him, then left the house, went to his truck which was parked outside and threw the car

keys at plaintiff when she, her sister, and their host came out to urge him to return to the house where the party was being held. In the same category may be placed other events depicted by plaintiff in her testimony. For instance, an occasion when defendant in a fit of anger endeavored to walk away from his wife and child in Pittsburgh, and on another when going to an inn in the State of Ohio, plaintiff and defendant started across the bridge in defendant's truck to Wheeling Island, and then over the toll bridge to the Ohio side, defendant, discovering it would cost him fifty cents toll to cross the West Virginia-Ohio bridge, became angry, turned his truck around on the bridge, and drove back to Wheeling Island. Nor does plaintiff's complaint that in August, 1944, while plaintiff was confined to a hospital after an operation, defendant caused what plaintiff's counsel designates as a "scene at her bedside", constitute a ground for divorce, especially in view of defendant's testimony that he was simply complaining of the treatment which his wife was getting at the hospital. These actions and fits of anger, though unjustified, do not constitute cruel and inhuman treatment within the meaning of our statute.

But plaintiff relies upon another event which occurred some time before the immediate events which culminated in the separation. About November, 1942, at a party at which a number of guests were entertained at the Myers home, and all were engaged in drinking intoxicants, evidently to excess, defendant and one of the male guests left the party and went upstairs to bed. During the course of a heated argument among those remaining downstairs, plaintiff made an attack on the religion embraced by defendant and one of the guests, and defendant came downstairs. According to plaintiff's testimony and that of two witnesses, defendant grabbed her, threw her to the floor, and was in the process of choking her when he was pulled away. According to his testimony, plaintiff and a guest had assumed a belligerent attitude toward each other, when defendant took hold of plaintiff and she fell to the floor. The record discloses that plaintiff was not hurt on

that occasion. Such happenings are those which are apt to occur where mixed crowds engage in the excessive use of intoxicants. Be that as it may, the parties continued to live together, and participated in their frequent parties until the events immediately preceding the separation, which plaintiff claims prompted her to leave the Myers home.

On these latter events plaintiff relies largely for the claim that she is entitled to a divorce. On the Saturday night before the parties separated, plaintiff and defendant left their infant children in their home with plaintiff's fourteen-year old nephew, and went in defendant's truck to the Eagles' Club in Wheeling, of which defendant was a member. Both plaintiff and defendant had gone there frequently on Thursday and Saturday nights to dance and drink beer. On their way to the club they picked up plaintiff's sister, who lived by herself in South Wheeling, her husband being in the army. Upon arriving at the club quarters, they found all the tables on the upper floor, where the dance was being held, occupied so they took a table downstairs, where they were joined later by six of their friends. Most of the members of the party drank some beer and engaged in a general discussion as to where they would go to dance. While seated at the table, defendant, who had worked hard that day laying a concrete walk without assistance, dozed or as plaintiff says "pretended to doze" at the table. When she nudged him, according to her testimony, he said "to hell with you", and left the room. According to his testimony he said, "to hell with it". He then left and went into a room known as the "billiard room". Shortly thereafter the other members of the party proceeded to go to a club known as the High Up Club, several miles outside the limits of the City of Wheeling. Before going, plaintiff and one or two members of the party made an effort to find defendant but without success. When they left they saw his truck, unoccupied, standing where defendant had parked it before entering the Eagles' Club. The members of the party, plaintiff riding in the automobile of one of the party, went

to the High Up Club, where they engaged in dancing. About four-thirty in the morning, they returned to Wheeling, and though the owner of the automobile in which plaintiff was riding had to pass the Myers house in returning to his home, plaintiff got out of the automobile at her sister's home, where she said she remained about fifteen minutes and then, thinking that she may have made a mistake, she took a taxi-cab and arrived at her home about five o'clock in the morning, where she found her husband in bed. After calling her nephew, who was accustomed to arise about five-thirty in the morning in order to deliver newspapers in Wheeling, plaintiff undressed and got into bed with defendant, where a quarrel arose. The parties give conflicting testimony concerning the cause of the quarrel and the happenings in the course thereof. Defendant says that when he tried to make love to plaintiff, she kicked him in the "privates", called him vile names, and threatened: "I could knock your head off and cut your guts out. I just hate you"; that he became irritated, got a hammer and a knife, and holding the knife against himself dared plaintiff to cut him. A struggle ensued, during which plaintiff's fingers were cut. Plaintiff admits that defendant, after seeing the blood, seemed to come to his senses, and carried her to the kitchen where he bandaged the cuts on her fingers. Plaintiff testified that defendant struck her, giving her a black eye, knocked her out of bed, then got a butcher knife from the kitchen, pursued her into the bedroom of their older child, knocked her down and brandished the knife over her, cutting her fingers. After her fingers were bandaged, the parties went to bed, but later defendant arose, dressed and went to church. After he returned from church, plaintiff and defendant spent the rest of the day quietly. Defendant testified that they went to bed in the aforenoon and had sexual intercourse. This plaintiff denied. They did, however, sleep together that night, kissing each other "good night". Again the testimony conflicts on the question whether the parties engaged in sexual intercourse that night. The next day, Monday, plaintiff prepared defend-

ant's breakfast. As he went to work he drove plaintiff and the children to the home of plaintiff's parents, where they remained during the day. Defendant had his evening meal there, and then both plaintiff and defendant returned home with the children. That night defendant testified that he and plaintiff slept together, but, according to plaintiff's testimony, defendant slept in the truck in the garage. After breakfast the next day, defendant went to work. When he returned he found that plaintiff had gone to her parents' home, taking with her the children, money, bonds and insurance policies described in her replication, and neither she nor the children has returned since, though the record discloses that defendant has often importuned her to do so.

Whether defendant's induction into the armed forces of the United States was prompted by plaintiff's action is not disclosed by this record. Defendant introduced into the evidence a letter signed "A Friend", written by plaintiff's sister, and addressed to the Selective Service Board at Moundsville, stating that plaintiff and defendant were separated and that defendant was not supporting plaintiff and the children. Whether this letter was prompted by plaintiff and what effect, if any, it had upon defendant's classification, we cannot say. But even if plaintiff had caused the letter to be written, such fact is not pertinent on the question of defendant's alleged cruel and inhuman treatment. At most it simply bears on plaintiff's attitude toward defendant.

The trial court, in our opinion, was justified by the facts narrated in this record in finding that defendant was guilty of cruel and inhuman treatment of plaintiff within the meaning of Code, 48-2-4. We therefore are not at liberty to set aside the decree in so far as it severed plaintiff and defendant from the bonds of matrimony, unless plaintiff is barred from relief by reason of condonation of the wrongs charged and proved, or her own misconduct either in provoking or contributing to defendant's acts of violence toward her. Clearly, plaintiff has not condoned defendant's acts. The attempt at reconciliation consisting of plaintiff

and defendant kissing each other good night and going to bed together on the Sunday night after the quarrel did not amount to a condonation or reconcilation of the differences between the parties. In view of the conflict in the evidence and the finding of the trial court, we must assume that the parties did not resume marital relations. In *Norman* v. *Norman,* 88 W. Va. 640, pt. 1, syl., 107 S. E. 407, this Court held that in a suit for a divorce from bed and board, grounded upon cruel and inhuman treatment, that the acts relied upon for condonation of such treatment "must evidence an unequivocal intent to forgive the transactions complained of and to voluntarily resume marital relations."

Plaintiff's own conduct is decisive of this case. Evidently defendant had a high and, at times, especially when under the influence of intoxicants, an ungovernable temper. It must also be said that plaintiff was not always able to control her temper. She became angry at defendant when he attempted to pour beer down her sister's dress and waded in a creek. Though unjustified, this was done in a spirit of playfulness, not vindictiveness and hatred, and evidently was superinduced by the use of intoxicating liquor or beer. On one occasion at a party where intoxicating drinks were served, plaintiff engaged in a heated argument, during which she criticised the religion embraced by defendant and one of the guests, which culminated in defendant's alleged choking of plaintiff. At the Eagles' Club on the eve of the early Sunday morning quarrel, defendant, in our opinion, was tired. He had come home late after doing heavy labor laying a concrete walk without assistance. This seemed to try plaintiff's patience, and she chided him publicly for doing an entirely natural act in the instant circumstances. Moreover, she did not deny defendant's testimony that she kicked him in the "privates" during the early Sunday morning quarrel. This record teems with the narration of numerous all night parties, in which those present, including plaintiff and defendant, indulged in the use of intoxicating drinks. To a large extent she instigated her husband's participa-

tion in these parties. In fact, in response to the question whether she liked to go out and associate with their usual crowd of friends, she testified: "I like to go out and have a good time, yes." And further she testified that the crowd that she and her husband had been associating with belonged to the Eagles' Club, and plaintiff insisted and kept on insisting until he joined. She further testified that the happenings at the clubs and parties which she and defendant attended "contributed to or helped" to cause their marital troubles. We are impelled to the opinion that plaintiff herself initially urged her husband to engage in these frequent parties. Most of the quarrels portrayed by this record occurred during the course of these parties, or were the aftermath of them. Plaintiff's contribution to the difficult marital situation in which these parties now find themselves, in our opinion, should preclude her from the relief sought. If, as plaintiff testified, defendant initiated the Sunday morning quarrel, she provoked it by coming home from the High Up Club almost with the dawn of day. If her testimony is true, defendant was not justified in his actions, and neither was she. Taking as true the uncontradicted part of defendant's testimony concerning the quarrel on that Sunday morning, the parties engaged in what was tantamount to a mutual combat, defendant taking the more aggressive part, and plaintiff furnishing the only provocation which brought the quarrel to its violent climax. In this jurisdiction where a divorce is sought on the ground of cruelty based upon physical violence provoked by the complaining spouse provocation by the complaining spouse is material and may prevent the obtaining of relief. *Wolfe* v. *Wolfe,* 120 W. Va. 389, pt. 2 syl., 198 S. E. 209; 9 R. C. L., Subject Divorce and Separation, Section 353. Considering the evidence favorable to the plaintiff as true and drawing all reasonable inferences therefrom in plaintiff's favor, we must say, in view of the trial court's finding that defendant was guilty of statutory cruel and inhuman treatment of plaintiff, but the record also impels us to hold that plaintiff

has precluded herself from the relief sought by her own conduct.

For the foregoing reasons the decree of the Circuit Court of Marshall County is reversed and plaintiff's bill of complaint dismissed.

*Decree reversed; bill of complaint dismissed.*